**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MEDICA INSURANCE CO.,** | |
| *Plaintiffs,* | |
| **v.** | Case No. 1:22-cv-1440-RCL |
| **XAVIER BECERRA,**<br>Secretary of Health and Human Services, | |
| *Defendant.* | |

**MEMORANDUM OPINION**

This is an appeal from a decision of the Administrator of the Centers for Medicare & Medicaid Services (CMS) brought by Medica Insurance Company, a Health Maintenance Organization (HMO). The Administrator held that a formula used to calculate how much of Medica's costs Medicare must reimburse cannot include certain charges from doctors that were erroneously billed to an entity other than Medica. Because Medica counted such charges in its reimbursement calculations, the Administrator ruled that Medica owed CMS over six million dollars.

Before the Court are Medica's motion for summary judgment (ECF No. 15) and the Secretary of Health and Human Services' cross-motion for summary judgment (ECF No. 29). The Court holds that the Administrator misinterpreted the regulation governing that formula because its text, read in context, unambiguously permits inclusion of such charges. By excluding these charges, the Administrator effectively amended the regulation without engaging in the necessary notice-and-comment rulemaking procedure. And even if the Administrator's reading were permissible, the Court would still grant summary judgment to Medica because the Administrator's

1

unexplained change in position was arbitrary and capricious.  Therefore, the Court will **GRANT** Medica's motion for summary judgment, **DENY** the Secretary's cross-motion, and **REMAND** the matter to the agency for further proceedings consistent with this opinion.

## I.    BACKGROUND

The Court will first discuss the statutory and regulatory backdrop for Medica's dispute with CMS.  Then it will explain the specific dispute over "carrier-paid claims."  Next it will recount the steps that led the parties to this Court.

### A.  Statutory and Regulatory Framework

#### 1.  Medicare and Cost Plan HMOs

Medicare is a government health insurance program that provides coverage to eligible people who are either disabled or age 65 or older.  *See* 42 U.S.C. § 1395c.  It is administered by CMS.  Medicare Part B is an optional, supplemental government-subsidized insurance program that covers bills relating to physician, hospital outpatient, and other services.  Administrative Record (AR) 996 n.2.[1]  An entity that furnishes health care services under Part B, such as a doctor, is called a "supplier." 42 C.F.R. § 400.202.

One way for a Medicare beneficiary enrolled in Part B to receive benefits is to go with a traditional fee-for-service approach under which suppliers' charges for medical services are paid by Medicare.  Gov. MSJ, ECF No. 29 (as corrected), at 3.  The supplier files its claim not with Medicare itself, but instead with a private company assigned to the supplier, known as a Medicare Administrative Contractor ("MAC") or a "carrier."  *Id.* at 3.  The MAC helps administer the

---

[1] In accordance with Local Rule 7(n), the parties submitted a Joint Appendix containing relevant portions of the Administrative Record.  *See* Joint Appendix (ECF Nos. 37, 37-1, 37-2, 37-3).  When the Court refers to the Administrative Record, it will cite to the Bates numbers printed at the bottom of each page.

Medicare Part B fee-for-service program.  It processes the supplier's claim and, if it is covered by Medicare, pays Medicare's share of the claim.  *Id.* at 3.

A second way for a Medicare beneficiary enrolled in Part B to receive benefits is to join a managed care organization.  These include HMOs, which organize networks of suppliers with whom the HMO has contracted.  *See* 42 CFR § 417.548.  If you are a Part B beneficiary enrolled in an HMO, you will go to an in-network supplier, such as a doctor, for medical services.  The supplier will then charge the HMO for the service provided to you at a price set for that particular type of medical service by the contract between the HMO and the supplier.  In turn, Medicare will reimburse the HMO.

This case concerns a particular kind of HMO.  The great majority of Medicare beneficiaries are served by HMOs operating under the Medicare Advantage program.  AR 996.  However, a minority of beneficiaries receive their healthcare through what is known as a "cost plan" HMO. The distinctive feature of a cost plan HMO is that Medicare pays it for the "reasonable cost" of the reimbursable services it has provided to its Medicare beneficiaries.  AR 996; *see also* 42 U.S.C. § 1395mm(h)(2);  1395x(v)(1)(A);  42  C.F.R.  § 417.524(b)(2).   Under  the  Medicare  Act,  the "reasonable cost" of these services are defined in relevant part as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed  health  services."   42  U.S.C.  § 1395x(v)(1)(A).   This  figure  is  to  be  "determined  in accordance with regulations establishing the method or methods to be used, and the items to be included."  *Id.*.   The method of determining these costs must conform to the prohibition on cross-subsidization,  meaning  "the  necessary  costs  of  efficiently  delivering  covered  services  to individuals covered by the insurance programs established by [the Medicare Act] will not be borne

by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs." *Id.*.

### 2. Calculation of Reasonable Costs

Calculating the reasonable costs for which Medicare will reimburse the cost plan HMO is, unfortunately, not as simple as tallying up the specific amounts the HMO paid to suppliers for Medicare beneficiaries. The problem with that approach comes from the fact that the HMO has both Medicare and non-Medicare patients. As a result, the HMO has certain costs, such as administrative and general costs, that are spread across the business and cannot be neatly attributed to any single visit to the doctor's office, X-ray, or the like. CMS's solution has been to embrace a method of "apportionment" to determine how much of the HMO's expenses—including the costs of physicians and suppliers as well as administrative and general costs—Medicare should reimburse. *See* 42 C.F.R. § 417.560(c). This regulation, the "Cost Apportionment Regulation," provides a mathematical formula to apportion costs between Medicare enrollees and non-Medicare enrollees and thus determine the reasonable cost for which Medicare ought to reimburse the HMO. *See id.*. The purpose of the formula is to create a statistical proxy for the actual costs attributable to the HMO's Medicare claims rather than its non-Medicare claims. *See* AR 16; Pl. MSJ, ECF No. 15, at 15–16; Gov. MSJ at 5.

In this case, it is undisputed that the applicable cost plan apportionment formula is that laid out in 42 C.F.R. § 417.560(c). AR 78. Under this method, "the Medicare share of the cost of Part B physician and supplier services furnished to Medicare enrollees under arrangements, and paid for by the HMO . . . is determined by multiplying the total amount for all such services by the ratio of charges for covered services furnished to Medicare enrollees to the total charges for all such services." 42 C.F.R. § 417.560(c). In plain English, this means one first tallies up the total cost

of all services, including both "(1) the direct costs associated with furnishing services to Medicare and non-Medicare enrollees, and (2) certain indirect costs, such as enrollment and operations costs." *Rocky Mountain Health Maint. Org., Inc. v. Price*, 297 F. Supp. 3d 152, 155 (D.D.C. 2018) (*Rocky Mountain I*) (emphasis omitted).  That figure is then multiplied by the apportionment ratio. This consists of a numerator—"charges for covered services furnished to Medicare enrollees"— divided by a denominator—"the total charges for all such services."  The calculation produces "[t]he HMO's reimbursable 'costs actually incurred' under the Medicare Act."  *Rocky Mountain I*, 297 F. Supp. 3d at 155.

### 3.  Reimbursement

Reimbursement of the cost plan HMO occurs through preliminary monthly payments and a yearly reconciliation process that results in a final settlement for that period.  At the close of the fiscal year, the HMO submits a "cost report" to CMS that provides its total allowable costs for that fiscal year.  *See* 42 C.F.R. §§ 417.570-417.576.  To ensure that it pays only its share of the HMO's allowable costs—and does not improperly subsidize the HMO's non-Medicare operations—CMS reviews the cost report.  *See* 42 U.S.C. §§ 1395x(v)(1)(A), 1395mm(h)(3)–(4); 42 C.F.R. §§ 413.9, 413.24, 417.532, 417.534, 417.568, 417.576.  If CMS is satisfied with the cost report, it issues a Notice of Program Reimbursement containing its final determination of how much the HMO will be reimbursed for the reporting period.  *See* 42 C.F.R. § 405.1803(a)(1), 417.576(d)-(e).  This figure is compared to the monthly preliminary payments CMS has made to the HMO over the year so that any necessary retroactive adjustment can be made.  *See* 42 U.S.C. § 1395x(v)(1)(A).  If there has been overpayment, the HMO pays CMS; if there has been underpayment, CMS pays the HMO.  42 C.F.R. § 405.1803(c), 413.60(c).

If the HMO objects to CMS's final determination, it may pursue administrative and judicial review. First, it may seek a hearing before an in-house CMS hearing officer. *See* 42 C.F.R. § 417.576(d)(4). The hearing officer's decision is subject to review by the CMS Administrator. The final agency action is either the decision of the hearing officer or, if the Administrator reviews that decision, the decision of the Administrator. From there, the HMO may seek review in federal district court. 42 U.S.C. § 1395oo(f)(1).

### 4. Carrier-Paid Claims

If you find this system difficult to understand, you are not alone. In fact, this case arises from doctors and other providers repeatedly failing to realize which claims are supposed to go to HMOs and which are supposed to go to MACs. On occasion, the HMO's in-network supplier will provide services to the HMO's Medicare beneficiary member, but instead of submitting the claim to the *HMO*, it will erroneously submit the claim to a *MAC*. Or it may submit the claim to them *both*. When either happens, the MAC will pay the provider without involving the HMO because the MAC is legally required to promptly pay all "clean claims" (i.e., claims without defects or impropriety). 42 U.S.C. § 1395u(c)(2)(A)(i), (c)(2)(B)(i); AR 20. When a MAC pays a provider directly and without the HMO's involvement, those are known as a "carrier-paid claims." *Rocky Mountain I*, 297 F. Supp. at 152.[2] This case turns on whether the HMO can receive reimbursement from Medicare for such charges.

---

[2] Medica calls these "MAC/Medica claims," emphasizing Medica's role, while the Secretary calls these "MAC-incurred charges," minimizing it. The Court opts for a more neutral term. *See Scott & White v. Becerra*, No. 22-cv-3202 (CRC), 2023 WL 6121904, at *1 (D.D.C. Sept. 19, 2023) (referring to these charges as "carrier-paid claims").

### B.  Factual History

#### 1.  Medica's Processing of Carrier-Paid Claims

The plaintiff in this case is Medica Insurance Company, which operates a cost plan HMO. Pl. MSJ at 6.  As with other cost plan HMOs, Medica contracts with physicians and other suppliers to provide Medicare Part B services to its cost plan enrollees.  Pl. MSJ at 6–7; AR 69, 116.  Once an in-network supplier provides care to a beneficiary, the supplier should send a claim to Medica. Pl. MSJ at 7; AR 69.  Medica will then process the claim.  Medica also generates an Explanation of Benefits that provides the enrollee with information about the service and payment.  AR 69–70. Medica contends that it cannot create an EOB without actually processing and paying the claim itself.  AR 119 (Tr. 33:9–21), 123 (Tr. 51:1–19).

And as with other cost plan HMOs, Medica must deal with the recurring problem of physicians erroneously submitting a claim to a MAC instead of, or in addition to, Medica.  AR 120 (Tr. 40:8–21).  To be clear, payments made by the MAC on such claims are made in error, as responsibility for paying the carrier-paid claim lies with Medica, not the MAC.  AR 121 (Tr. 41:6– 10).  Sometimes the physician's billing office bills both the MAC and Medica.  AR 121 (Tr. 41:11– 42:24). When that occurs, Medica says it often pays the claim before MAC does, and thus does so without knowledge that the MAC will later pay the same claim.  Pl. MSJ at 8; *see* AR 117–118. Usually, however, a carrier-paid claim arises because the physician billed the MAC instead of Medica.  AR 121 (Tr. 41:11–42:24).

When the MAC pays the claim, it often fails to pay the correct amount to the physician because it lacks key information such as the payment amount set by contract between Medica and the supplier.  AR 119 (Tr. 34:2–23).  Instead of paying the contractual rate, it pays the Medicare fee-for-service rate.  AR 121 (Tr. 42:25–43:13).  When a MAC pays a carrier-paid claim, Medica

will still process the claim.  AR 121 (Tr. 42:2–24).  This means that Medica "(i) determines the correct amount due the physician under Medica's contract with the physician, (ii) calculates the co-pay, deductible, or coinsurance due from the patient, (iii) recoups the erroneous MAC payment, (iv) processes the payment to the physician at the correct payment amount, after factoring in the correct patient contribution, and (v) gives the patient credit toward any annual deductible or cost-sharing obligation."  Pl. MSJ at 9 (citing AR 121–24).

When Medica says it "recoups the erroneous MAC payment," that refers to a bookkeeping maneuver.  Basically, if Medica sees that the MAC has erroneously paid the doctor, say, $100 for a patient's check-up, Medica goes into its system, subtracts $100, and pays or invoices the supplier for any difference between what the MAC paid and what Medica should have paid.  *See* AR 123, 125.  Then at the end of the year when Medica compiles its cost report, it credits the $100 to the government.  AR 125 (Tr. 57:11–25).  So Medica does not directly profit from the MAC's mistake.  But it uses the carrier-paid claim to boosts the sum that it will receive from the government as reimbursement by including the $100 associated with the carrier-paid claim in the numerator and denominator of the apportionment ratio, AR 126—even though because the MAC actually paid the doctor the $100, "the HMO incurs no out-of-pocket costs for those services, except perhaps a residual sum."  *Rocky Mountain I*, 297 F. Supp. at 152.  Medica does, however, expend resources processing the claim.  AR 127.

Medica justifies processing and paying the claim, even though the MAC has already paid all or much of the claim, because "[i]t would be impossible for Medica to correct the physician and patient payment amount, give the patient credit toward his or her annual limits, and/or generate an EOB without actually processing and paying the physician claim."  Pl. MSJ at 9 (citing AR 119 (Tr. 33:9–21)).  Medica cannot simply put a note in the file or edit the record, it says, because not

actually processing and paying the claim "would undermine the integrity of the system, disrupt the audit trail, and open the door to fraudulent activity."  Pl. MSJ at 9 (citing AR 123 (Tr. 51:1–19)).

### 2. Medica's 2006–2011 Cost Reports

 At issue in this case are Medica's annual cost reports for the years 2006 through 2011. For each cost report, Medica included the carrier-paid claims it had processed.  AR 124–25 (Tr. 56:15–57:10).  Medica also credited to CMS the funds it had recouped from doctors for the erroneous carrier-paid claim.  AR 125 (Tr. 57:11–25).  What this means is that Medica submitted a cost report intended to both "reflect as if the error had not been made," by looking as if Medica only had paid the claim, and to "unwind that erroneous payment," by returning to CMS the money the MAC had erroneously paid to the physician by including the sum on a settlement sheet called Worksheet M.  AR 125 (Tr. 57:11–25, 58:9–22).  The key fact is that when Medica calculated the cost to which it was entitled to reimbursement, it included the charges associated with the carrier-paid claims in the apportionment ratio's numerator and denominator.  *See* AR 124–26.

### C. Procedural History

 Initially, CMS issued two Notices of Program Reimbursement for the years of 2006 through 2011 that did not take issue with Medica's inclusion of carrier-paid claims.  AR 234 (Stipulated Facts).  However, in June 2016 CMS informed Medica that "statistics associated with [carrier-paid] claims should not be included in your apportionment statistic." *Id.*.  Following these discussions, a CMS-contracted auditor recalculated Medica's reimbursement for the 2006–2011 cost reports, reducing the figure by about $6.3 million.  AR 1850.  To be clear, the dispute concerned whether charges for carrier-paid claims could be included in the apportionment ratio,

not whether the costs of payments for these claims may be included among the total costs that are multiplied by that ratio.  *See* Pl. Reply, ECF No. 25, at 4; AR 16–18.

Medica claims—and the Secretary disputes—that "CMS eventually agreed with Medica's method for accounting for such claims that were recouped in a year subsequent to when they were paid" because "[f]or those claims, CMS agreed that Medica could return the recouped amounts to CMS on the cost report and include the physician charges associated with the carrier-paid claims in the apportionment ratio."  Pl. MSJ at 11 (citing AR 129, 475–76).  Medica bases this characterization on an email from a CMS employee telling CMS: "For duplicate claims (claims processed by both the MAC and Medica) that are determined outside of a cost reporting year, those prior year claims can be refunded to CMS through an adjustment on [Worksheet] M."  AR 475.  The government argues that CMS merely instructed Medica to credit back its duplicate payment and points out that the email said nothing about including carrier-paid claims in the apportionment calculation.  Gov. MSJ at 26–27.  The Secretary further argues that the email reflects a decision made by a CMS employee, not official CMS policy.  Gov. Reply, ECF No. 36, at 21–22.  At any rate, the parties certainly did not agree on what to do with claims paid by a MAC and processed by Medica in the same year.  *See, e.g.*, AR 1493.  CMS concluded that Medica had improperly included the MAC-incurred charges in its cost reports.  In May 2019 CMS revised its Notices of Program Reimbursement for the years of 2006 through 2011 to reflect the lesser sum.  AR 1473.

Medica timely appealed.  AR 1472.  Medica prevailed in the initial administrative hearing before the CMS hearing officer, who held that by removing charges for carrier-paid claims from the apportionment calculation, CMS violated the plain meaning of 42 C.F.R. § 417.560(c).  AR 83.  However, the CMS Administrator chose to review the decision and in March of 2022 reversed the ruling of the hearing officer.  *See* AR 21, 60.  The Administrator reasoned that Medica's costs

associated with carrier-paid claims were not costs "actually incurred and necessary in the efficient delivery of patient care services," and so were ineligible for reimbursement.  AR 19.  "[T]he charges used in the apportionment statistics," she wrote, "must be related to the costs incurred for services furnished under arrangements and paid for by the HMO."  AR 14. Medica then filed the present lawsuit.  *See* Compl., ECF No. 1.

### D.  Motions Presently Before the Court

Before the Court are two motions.

First, Medica has moved for summary judgment.  Pl. MSJ.  Second, the Secretary opposes plaintiff's motion and has cross-moved for summary judgment.  Gov. MSJ.  Medica has filed a memorandum in opposition to the Secretary's motion and in reply to the Secretary's opposition. Pl. Reply.  And the Secretary has filed a reply in support of his cross-motion.  Gov. Reply.

These motions are ripe for review.

## II.   LEGAL STANDARDS

### A.  Summary Judgment in the APA Context

Ordinarily, summary judgment is governed by Federal Rule of Civil Procedure 56.  *See* Fed. R. Civ. P. 56(a).  However, Medica has filed suit under the Administrative Procedure Act (APA).  Compl. ¶¶ 78–82; *see also* 5 U.S.C. § 706.  And "[i]n cases involving review of a final agency action under the APA . . . Rule 56's standard does not govern."  *Truitt v. Kendall*, 554 F. Supp. 3d 167, 174 (D.D.C. 2021) (citing *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006)).  The difference flows from the APA's allocation of authority between the agency and the district court.  Under the APA, resolving factual issues and reaching a decision supported by the administrative record is the role of the agency, not the court.  *Truitt*, 554 F. Supp. 3d at 174. When a district court considers a summary judgment motion on an APA claim, its duty is to "determine *as a matter of law* whether the agency's decision was arbitrary, capricious, an abuse

of discretion, or unlawful." *Truitt*, 554 F. Supp. 3d at 174 (citing *Sierra Club*, 459 F. Supp. 2d at 89–90); *see also* 5 U.S.C. § 706 (setting out the duties of a court reviewing an APA claim). This means "the district court sits as an 'appellate tribunal' and must answer . . . legal questions based on the evidence in the administrative record." *Truitt*, 554 F. Supp. 3d. at 174 (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

## B.  Judicial Review Under the APA

Medica challenges CMS's action as inconsistent with the agency's own regulation, contrary to the Medicare statute, arbitrary and capricious, and violative of fair notice and due process. Pl. MSJ at 2–3. Under the APA, the reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" that are, among other defects, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" unconstitutional; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law." 5 U.S.C. 706(2). The arbitrary and capriciousness standard is "very deferential." *Shawal, Inc. v. Lynch*, No. 14-cv-01512 (RCL), 2015 WL 7761053, at *3 (D.D.C. 2015). In judging whether an agency action is arbitrary and capricious, the reviewing court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the agency action will stand so long as the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

In general, agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.  When an agency changes its position, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position" and so "[a]n agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  This is so even when an agency departs from past practice rather than past policy.  *See Am. Wild Horse Pres. Campaign v. Perdue,* 873 F.3d 914, 927 (D.C. Cir. 2017).

When evaluating an agency's adherence to its own regulations, a court must consider whether the agency's interpretation merits *Auer* deference.  *See Auer v. Robbins*, 519 U.S. 452 (1997).  "Courts defer to an agency's interpretation of its own regulation if the regulation in question is 'genuinely ambiguous' and if the agency's reading is reasonable." *Doe v. Sec. & Exch. Comm'n*, 28 F.4th 1306, 1311 (D.C. Cir. 2022) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019)).  *Auer* deference is only appropriate only when "the character and context of the agency interpretation entitles it to controlling weight" because the interpretation is the agency's "'authoritative'" or 'official position,'" "implicate[s]" the agency's "substantive expertise," and "reflect[s] fair and considered judgment." *Kisor*, 139 S. Ct. at 2416–18.  A court will not "defer to a new interpretation . . . that creates 'unfair surprise' to regulated parties," especially when "an agency substitutes one view of a rule for another." *Kisor*, 139 S. Ct. at 2418 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)).  When an interpretation does not merit *Auer* deference, "courts should not give deference to an agency's reading, except to the extent it has the 'power to persuade.'" *Kisor*, 139 S. Ct. at 2414 (quoting C*hristopher v. SmithKline*

13

*Beecham Corp.*, 567 U.S. 142, 159 (2012)); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

## III.    DISCUSSION

### A.  The Administrator Misinterpreted the Governing Regulation

Medica has the best reading of the Cost Apportionment Regulation, 42 C.F.R. § 417.560(c).  The text of the Regulation, read in context, clearly permits carrier-paid claims to be included in the apportionment ratio.  Even if the Court found the Regulation ambiguous—which it does not—it would not accord *Auer* deference to CMS's interpretation and would reject the agency's reading of the statute.  An agency is bound by its own regulations, correctly understood.  *See Reuters Ltd. v. F.C.C.*, 781 F.2d 946, 950 (D.C. Cir. 1986) (observing that "it is elementary that an agency must adhere to its own rules and regulations.").  Because the Administrator misread the Regulation, the Court holds that the CMS's decision was "not in accordance with law," 5 U.S.C. § 706(2)(A), and must be set aside.

### 1.  The Regulation Unambiguously Accords with Medica's Interpretation

For the reasons that follow, the governing regulation is unambiguous, and so not entitled to *Auer* deference.  The best reading of the regulation's text, taking into account the larger context, is that carrier-paid claims may be included in the apportionment calculation.

### (i)  The Text's Plain Meaning Is That Carrier-Paid Claims May Be Included

The plain meaning of the Cost Apportionment Regulation is that all "charges for covered services furnished to Medicare enrollees," including those associated with carrier-paid claims, may be included in the apportionment ratio.

The crux of the dispute between the parties is the meaning of the Regulation, 42 C.F.R. § 417.560(c).  That provides the formula for calculating Medica's reimbursable "costs actually incurred," 42 U.S.C. § 1395x(v)(1)(A).  It reads:

> The Medicare share of the cost of Part B physician and supplier services furnished to Medicare enrollees under arrangements, and paid for by the HMO . . . is determined by multiplying the total amount for all such services by the ratio of charges for covered services furnished to Medicare enrollees to the total charges for all such services.

42 C.F.R. § 417.560(c).  On its face, the Regulation thus obliges CMS to include "charges for covered services furnished to Medicare enrollees" in the numerator and the denominator of the apportionment ratio.  And the parties have stipulated that the carrier-paid claims "were for covered services furnished to Medicare enrollees in Medica's cost plan."  AR 233 (Stipulated Facts).

Medica argues that the "plain language" of the Regulation requires CMS to count the carrier-paid claims in the ratio.  Pl. MSJ at 15.  Medica's view has a syllogistic logic.  Major premise: "charges for covered services" must be included in the numerator and denominator.  Minor premise: the carrier-paid claims were for covered services. Conclusion: the carrier-paid claims must be included in the numerator and denominator.  However, Medica's view depends on another premise: that the Regulation requires *all* "charges for covered services" to be included— regardless of whether the HMO or a MAC incurred the cost for the service.   Is this premise valid? If so, Medica's conclusion is inescapable.  If not, its argument fails.

Medica points out that the Regulation does not qualify the phrase in any way.  Pl. MSJ at 15.  If read literally, the Regulation does require the inclusion of *all* "charges for covered services."  The Secretary urges the Court to read the text in context, by which he means considering the Regulation's "overarching purpose, surrounding language, the statute it implements, and neighboring regulations" as well as the results of Medica's reading in "produc[ing] absurd consequences, and require[ing] Medica to engage routinely in transactions that serve no bona fide economic purpose but to prevent Medica from unlawful double-dipping."  Gov. MSJ at 10.

The Court is mindful that, as Justice Barrett recently put it, fidelity to the text requires situating "text in context."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012) (observing that "interpretation always depends on context").  "Context is not found exclusively 'within the four corners' of a statute."  *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring) (quoting John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2457 (2003) (cleaned up)).  It also includes "[b]ackground legal conventions" and "common sense."  *Id.* And it involves the "evident purpose of what a text seeks to achieve."  Scalia & Garner, *supra*, at 20.

But of course a Court must start with the text itself.  Section 417.560(c) is best understood if disassembled into its components:

- The Medicare share of the cost of Part B physician and supplier *services* furnished to Medicare enrollees under arrangements, and paid for by the HMO . . .
- is determined by multiplying the total amount for all *such services* by
- the ratio of
  - charges for covered *services* furnished to Medicare enrollees to
  - the total charges for all *such services*.

The Regulation twice refers to "such services." The first reference to "such services"—defining the base figure—evidently refers back to "physician and supplier services furnished to Medicare enrollees under arrangements, and paid for by the HMO" because "such" is another way of saying "[t]hat or those; having just been mentioned." *Black's Law Dictionary* 1661 (10th ed. 2014). The Secretary contends that the second reference to "such services"—defining the denominator of the apportionment ratio—refers to the same phrase. Gov. MSJ at 12. As the numerator goes, so goes the denominator, as "both semantics and statistics suggest that the term 'covered services' in the ratio's numerator means the same thing as the term 'such services' in the ratio's denominator." *Id*. The Secretary thus reads the Regulation to limit the numerator and denominator of the apportionment ratio to supplier services "paid for by the HMO."

Recently, another court in this district addressed the issue of whether carrier-paid claims could be included in the apportionment ratio. *See Scott & White Health Plan v. Becerra*, No. 22-cv-3202 (CRC), 2023 WL 6121904 (D.D.C. 2023).[3] Like the Secretary, the court in *Scott & White* read the first mention of "such services" to refer to "physician and supplier services furnished to Medicare enrollees under arrangements, and paid for by the HMO." *Scott & White*, 2023 WL 6121904, at *7. However, it interpreted the second reference to "such services" to refer to "covered services furnished to Medicare enrollees." *Scott & White*'s reading is persuasive. The Secretary cites *Miss. ex rel. Hood v. AU Optronics Corp.*, in which the Supreme Court observed that the "'presumption that a given term is used to mean the same thing throughout a statute' is 'at its most vigorous when a term is repeated within a given sentence.'" 571 U.S. 161, 171 (2014) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). But while the *presumption* may be that a

---

[3] An additional court in this district also heard a case centered on this issue, but it did not reach the merits in either of its opinions. *See Rocky Mountain Health Maint. Org., Inc. v. Price*, 297 F. Supp. 3d 152, 157–58 (D.D.C. 2018) (*Rocky Mountain I*); *Rocky Mountain Health Maint. Org., Inc. v. Azar*, 384 F. Supp. 3d 80, 83 (D.D.C. 2019) (*Rocky Mountain II*).

single term within a single sentence has a single meaning, here that presumption is defeated by a clear signal from the text.

As *Scott & White* noticed, there is a "meaningful variation" between the first and second references to services. *Scott & White*, 2023 WL 6121904, at *7. The regulation first mentions "physician and supplier services *furnished to Medicare enrollees* under arrangements, *and paid for by the HMO*." 42 C.F.R. § 417.560(c) (emphasis added). The next reference, in defining the numerator, retains the "furnished" requirement but drops the "paid for" requirement. *Scott & White*, 2023 WL 6121904, at *7. The denominator is then defined as the "total charges for all such services," which is mostly obviously read to refer to the immediately preceding mention of services, because under the "last-antecedent" canon, "the correct antecedent is usually 'the nearest reasonable' one." *Boechler, P.C. v. Comm'r of Internal Revenue*, 142 S. Ct. 1493, 1498 (2022) (quoting Scalia & Garner, *supra*, at 144). The omission of "paid for by the HMO" "indicates that—unlike the base figure that only includes costs borne by the HMO—this ratio includes *all* charges for furnished services, regardless of which entity picked up the tab." *Scott & White*, 2023 WL 6121904, at *7.

The Secretary's approach, that the numerator and denominator are defined with reference to services paid for by the HMO, is untenable. It is unreasonable to assume that the Regulation's drafters meant nothing by attaching the "paid for" requirement to the first reference to "services" and dropping it for the next one. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). This Court thus joins the CMS hearing officer, Medica, and the *Scott & White* court

in concluding that the Regulation's plain meaning is that carrier-covered claims are to be included in the apportionment ratio.  As the hearing officer found, the "plainest reading" of the Regulation is that the ratio includes carrier-paid claims.  *See* AR 68.

### (ii) The Context Does Not Change the Text's Plain Meaning

Although context may defeat the literal reading of a text, *see Nebraska*, 143 S. Ct. at 2379 (Barrett, J., concurring), it does not do so in this case.  To begin with, a key piece of context supports Medica's reading.  The Regulation uses the term "costs" for the base figure and "charges" for the apportionment ratio.  *Scott & White*, 2023 WL 6121904, at *8.  "Costs" and "charges" are distinct concepts.  As *Scott & White* noted, Medicare "regulations generally use 'costs' when discussing the amount an entity pays out of pocket to deliver a service."  *Scott & White*, 2023 WL 6121904, at *8 (citing 42 C.F.R. § 417.556(a)).  But "the word 'charges' is defined as the 'regular rates for various services that are charged to both beneficiaries and other paying patients who receive the services.'" *Scott & White*, 2023 WL 6121904, at *8 (citing 42 C.F.R. § 413.53(b)). Section 417.560(c) provides that the base figure is calculated based on "costs" that were "paid for by the HMO," so here it certainly matters whether a service was paid for the HMO or the MAC. By contrast, the apportionment ratio is measured based on the charge from the physician, rather than the cost to the HMO.  "These charges, which are determined by fixed rates per service, are not tied to the Plan's out-of-pocket expenses and, accordingly, do not turn on who 'paid for' the service." *Scott & White*, 2023 WL 6121904, at *8.

None of the Secretary's contextual arguments can rescue him from the Regulation's text. These arguments will be taken, and rejected, in turn.  First, the Secretary contends that the Medicare Act reinforces his argument that carrier-paid claims must be excluded from the apportionment ratio.  It is true that "a regulation must be interpreted so as to harmonize with and

further and not to conflict with the objective of the statute it implements." *Sec'y of Lab., Mine Safety & Health Admin. v. W. Fuels-Utah, Inc*., 900 F.2d 318, 320 (D.C. Cir. 1990) (cleaned up). The Court, then, "must construe regulations in light of the statutes they implement, keeping in mind that where there is an interpretation of an ambiguous regulation which is reasonable and consistent with the statute, that interpretation is to be preferred." *Id.*  But the Secretary's argument from the Medicare Statute begs the question by assuming the truth of its own conclusion.  The Secretary cites the provision that "[t]he reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A).  Surely, says the Secretary, claims paid by the MAC rather than Medica are not "actually incurred" by Medica and thus not part of the "reasonable cost."  Gov. MSJ at 13.

But whether costs are "actually incurred" and "reasonable" is to be "be determined in accordance with regulations establishing the method or methods to be used, and the items to be included."  *Id.* § 1395x(v)(1)(A).  In other words, they are to be determined by 42 C.F.R. § 417.560(c), the regulation whose interpretation is the subject of this case.  Whether the Regulation permits inclusion of carrier-paid claims in the apportionment ratio depends on the interpretation of the Regulation itself.  The Secretary is basically asserting that the apportionment ratio does not include carrier-paid claims because the figure defined solely through that ratio does not include carrier-paid claims.  That is like saying we know cigarettes cause cancer because cigarettes are carcinogenic.  The Secretary's assumption of the conclusion he is seeking to prove is not context that can challenge the plain meaning of the text.

The Secretary also argues that Medica's position conflicts with the Medicare Act's prohibition on cross-subsidization.  This ban "prohibits shifting costs of Medicare services onto

non-Medicare patients" and "shifting costs from non-Medicare services onto the Medicare program." *New LifeCare Hosps. of N. Carolina, LLC v. Becerra*, 7 F.4th 1215, 1225 (D.C. Cir. 2021) (citing 42 U.S.C. § 1395x(v)(1)(A)). The Secretary argues that permitting Medica to count carrier-paid claims in the apportionment ratio would grant it a windfall of Medicare funds with which to subsidize the costs of its non-Medicare operations. Gov. MSJ at 14–15; Gov. Reply at 6–7. But the purpose of the ratio is to construct "a proxy for Medicare's share of an HMO's allowable costs," which include "an HMO's administrative and general costs . . . not readily attributable to a specific service that a specific supplier renders to a specific beneficiary." Gov. MSJ at 5. Therefore, "[i]ncluding carrier-paid claims within this ratio makes sense because doing so allows the Plan to recoup its *indirect* costs that support the provision of services provided to Medicare enrollees." *Scott & White*, 2023 WL 6121904, at *9; *see also* AR 127. Counting carrier-paid claims in the ratio does not present such a risk of cross-subsidization that the Regulation must be contorted to avoid it. None of the Secretary's arguments based on the Medicare Statute lead the Court to hesitate from embracing the Regulation's plain meaning.

Next, the Secretary cites five other Medicare regulations, arguing that these "neighboring regulations in particular indicate that the Medicare program calculates reimbursement based only on costs an HMO actually incurs." Gov. MSJ at 15. The Secretary invokes the *in pari materia* canon, according to which statutory provisions on the same subject are "construed together to discern their meaning." *Motion Picture Ass'n of Am., Inc. v. F.C.C.*, 309 F.3d 796, 801 (D.C. Cir. 2002). The Secretary, however, misapplies this canon. First, the canon typically concerns the interpretation of statutes, not regulations. *See, e.g.*, *Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006) ("[U]nder the *in pari materia* canon, statutes addressing the same subject matter generally should be read 'as if they were one law.'") (quoting *Erlenbaugh v. United States*,

409 U.S. 239, 243 (1972)); Scalia & Garner, *supra*, at 252 ("Statutes *in pari materia* are to be interpreted together, as though they were one law.").

But even if this doctrine applies equally to regulations, the argument fails.  It would be one thing if the Secretary were arguing for a particular term of art in the Regulation to be interpreted as having the same meaning as in other provisions.  *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 53 (2023) (noting that the Court's "reading of [a term in a regulation] also tracks how neighboring regulations use the term").   But instead, the Secretary invokes five Medicare regulations that do not use the phrase "charges for covered services" and do not address the apportionment ratio for supplier services.  The Secretary asks the Court to ignore the Regulation's plain meaning simply because that would make it operate more similarly to different regulations, doing different things, for different purposes.  But the principle of *in pari materia* does not apply "where the statutes, though relating to the same subject matter, have significantly different purposes."  *United Shoe Workers of Am., AFL-CIO v. Bedell*, 506 F.2d 174, 188 (D.C. Cir. 1974). The Secretary may refashion the Regulation to resemble other regulations, but the Court cannot.

 The Secretary's final contextual arguments stem from the purported consequences of Medica's interpretation of the Regulation.   First, the Secretary contends that "Medica's interpretation of Section 417.560(c), carried to its logical conclusion, also yields absurd results." Gov. MSJ at 17.  Specifically, the Secretary says that if the textually unqualified "charges for covered services" is read to include *all* such charges even if not incurred by the HMO, then one could also read the similarly unqualified "Medicare enrollees" to include those not actually enrolled by the HMO.  Gov. MSJ at 17.  The absurdity doctrine holds that "judges may deviate from even the clearest statutory text when a given application would otherwise produce 'absurd' results."  Manning, *supra*, at 2388.  But here the Secretary is not arguing that the application in

this case—inclusion of carrier-paid claims in the apportionment—would itself be absurd.  Nor could he, since CMS's own in-house hearing officer endorsed this position, AR 67–83, as has a court in this district, *Scott & White*, 2023 WL 6121904.  The Secretary is arguing instead that Medica's logic, when applied to a *different* part of the Regulation, would yield absurd results.  But that is to conflate the absurdity doctrine, so rarely applied by courts, with the "slippery slope" cliché, so often invoked by lawyers.  Because Medica's interpretation would not itself produce absurd results, the absurdity doctrine does not apply.

In a similar vein, the Secretary contends that Medica's interpretation "is unsound [in] that it requires Medica routinely to engage in transactions that serve no bona fide economic purpose simply to avoid breaking the law."  Gov. MSJ at 17–18.  By this, the Secretary has in mind Medica claiming reimbursement for the charge while, to avoid double-dipping, purporting to return to the MAC the sum Medica would have paid the supplier but for MAC doing so first.  Gov. MSJ at 18.  The Secretary also questions why Medica should be able to include carrier-paid claims in its apportionment calculation when "[a]s a matter of financial reality, Medica does not incur the charge the MAC paid."  Gov. MSJ at 1–2.  Yet whatever qualms the Secretary has about this practice, he does not go so far as to label it is an absurd result.  There is no "unsound result" doctrine that would let a court rewrite regulations.  The absurdity doctrine "'does not license courts to improve statutes (or rules) substantively, so that their outcomes accord more closely' with 'what we might think is the preferred result."  *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2460 n.3 (2021) (Gorsuch, J., dissenting) (quoting *Jaskolski v. Daniels*, 427 F.3d 456, 461 (7th Cir. 2005) (Easterbrook, J.) (cleaned up)).   The Secretary's warnings about the consequences of Medica's position therefore do not provide good reasons to ignore the words chosen by the Regulation's drafters.

Text must be read in context. But that does not mean text may be subordinated to extraneous considerations. The Court holds that the Regulation is unambiguous and permits Medica to include the carrier-paid claims in the numerator and denominator of the apportionment ratio.

### (iii) Since the Regulation Is Unambiguous, *Auer* Deference Is Not Merited

For the reasons discussed above, the Regulation is not "genuinely ambiguous," and therefore CMS's interpretation does not merit *Auer* deference. *See Kisor*, 139 S. Ct. at 2414. Instead, the Court will defer to CMS's reading only "to the extent it has the 'power to persuade.'" *Kisor*, 139 S. Ct. at 2414 (quoting *Christopher*, 567 U.S. at 159). But the Secretary's reading is unpersuasive and deserves no deference. The best reading of the Regulation is that carrier-paid claims may be included in the apportionment calculation, and the Court adopts that interpretation.

### 2.   Even if the Regulation Were Ambiguous, the Court Would Not Accord *Auer* Deference to the Administrator's Interpretation

As the Court finds the Regulation is not "genuinely ambiguous," *Auer* deference does not apply. But even if the Court did find the Regulation ambiguous, it would not accord CMS's interpretation *Auer* deference and would still find that Medica had the best reading of the text.

The Administrator's conclusion that the apportionment ratio must exclude carrier-paid claims was "a new interpretation . . . that creates 'unfair surprise' to regulated parties." *Kisor*, 139 S. Ct. at 2418 (quoting *Long Island Care*, 551 U.S. at 170). Anyone who read the Regulation would most naturally conclude that because the Regulation does not qualify "charges for covered services" and does not repeat the "paid for" requirement, it includes all such charges, including those for carrier-paid claims. Nor would one have received any clear contrary indication from the agency, at least at the time Medica was preparing its 2006–2011 cost reports. As the hearing

officer observed, "[f]or the FYEs 2006-2011 cost reporting periods at issue here, there is no additional sub-regulatory guidance which further refines how to calculate the apportionment ratio in the specialized situation where a MAC also pays a Medicare enrollee's claim despite the cost plan's legal arrangement to do so." AR 68. Also, CMS did not object to Medica including carrier-paid claims in its apportionment formula when it issued Notices of Program Reimbursement for Medica's 2006-2008 and 2009-2011 cost reports in 2013 and 2015, respectively. AR 234. Medica cannot be blamed for relying on the uncontradicted best reading of the Regulation. So as the court found in *Scott & White*, CMS's decision to retroactively apply a different interpretation of the Regulation "risks the sort of 'unfair surprise to regulated parties' the Supreme Court has counseled against." *Scott & White*, 2023 WL 6121904, at *12 (quoting *Kisor*, 139 S. Ct. at 2418).

**B. The Administrator's New Interpretation of the Governing Regulation Effectively Amended CMS's Regulations, and Thus Violated the Medicare Statute**

There is another reason the Administrator's decision was "not in accordance with law." 5 U.S.C. § 706(2)(A). By grafting on an extra requirement, the agency effectively amended the Cost Apportionment Regulation without engaging in the notice-and-comment rulemaking required by the Medicare Statute. The Administrator's decision therefore violated this statute.

Under the plain language of 42 C.F.R. § 417.560(c), Medica was permitted to include carrier-paid claims in calculating its apportionment ratio. Medica argues that the Secretary violated the Medicare Act by attempting to ban inclusion of such charges without engaging in notice-and-comment rulemaking. As a policy matter, the Secretary takes serious issue with including carrier-paid claims in the apportionment ratio. *See, e.g.*, Gov. MSJ 17–19. The Secretary is free to act on those concerns—by going through the process prescribed by Congress in the Medicare Act. Only through rulemaking may the Secretary adopt any "rule, requirement, or other

statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services."  42 U.S.C. § 1395hh(a)(2).  There is no exception for interpretive rules. *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019).  When the Secretary engages in such rulemaking, the government must provide public notice and a 60-day comment period.  42 U.S.C. § 1395hh(b)(1).

The Secretary never undertook rulemaking to prohibit HMOs from including carrier-paid claims in the apportionment ratio.  Nor did CMS provide other public guidance on this issue: the hearing officer found, and the Administrator did not dispute, that "the regulation and cost report worksheet instruction does not expressly address whether paid claims are to be included in the ratio."  AR 16.  At most, CMS communicated its view to Medica informally, *see* AR 506, and then through the Administrator's ruling, AR 4–22.  The Secretary denies that the Administrator's decision triggered the rulemaking requirement, however, because it "simply applie[d] her longstanding interpretation of Section 417.560(c) to Medica's cost reports for the years at issue."  Gov. MSJ at 23.  Yet the evidence for a longstanding ban on counting carrier-paid claims is lacking.  The best the Secretary can come up with is the Medicare Managed Care Manual.  Since before the enactment of the Medicare Act's rulemaking provision, the Secretary contends, the Manual has provided that an HMO must recoup its own overpayment, not that of the MAC.  Gov. MSJ at 23 (citing AR 21 n.15).  But that does not mean that the HMO cannot include carrier-paid claims in its apportionment ratio, and the Secretary conspicuously fails to cite any specific evidence that CMS promulgated that view before the rulemaking requirement came into effect.

The Secretary argues that "Medica cites no regulation or guidance document by the Administrator directing or allowing HMOs to count charges for MAC-paid claims in their cost reports."  Gov. Reply at 16.  But that gets things backward.  The Secretary must show the practice

was forbidden; Medica need not show it was affirmatively allowed.  The Secretary asserts that CMS's years-long failure to object to Medica's inclusion of such charges in its apportionment ratio does not evidence a permissive policy but instead resulted from CMS's simple ignorance of HMOs including carrier-paid claims in their apportionment ratios.  Gov. Reply at 16–17.  This claim is startling, as it would "confound if CMS had no awareness of a multi-decade practice that implicates millions of dollars in revenue."  *Scott & White*, 2023 WL 6121904, at *11.  But even if it were true, it only would confirm that until recently CMS did not have a policy in place forbidding inclusion of carrier-paid claims.

When CMS did attempt to implement this policy, it failed to do so through the required notice-and-comment procedure.  "If the agency seeks to rework this apportionment formula, it must revise the regulation through the Medicare Act's notice-and-comment process as specified in 42 U.S.C. § 1395hh(a)(2) and further detailed in" *Allina Health Servs. v. Price*, 863 F.3d 937 (D.C. Cir. 2017), *aff'd sub nom. Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).  *Scott & White*, 2023 WL 6121904, at *12; *accord Vista Hill Found., Inc. v. Heckler*, 767 F.2d 556, 566 (9th Cir. 1985) ("[I]f it turns out that the disadvantages to the Medicare program of continuing to use the present method of cost allocation outweigh the advantages or that the policies of the act are being frustrated by the use of that method, we assume the Secretary will amend her regulations or be told to do so by the Congress.").  Here, CMS violated the Medicare Statute by attempting to banish carrier-paid claims from the apportionment ratio without notice-and-comment rulemaking.[4]

---

[4] Medica also argues that excluding carrier-paid claims from the apportionment ratio would violate the Medicare Act's prohibition on cross-subsidization, discussed above, by resulting in Medica's non-Medicare patients subsidizing some of Medica's operations relating to its Medicare patients.  Pl. MSJ at 22–23.  Resolving the issue of whether CMS has authority to issue a rule excluding these charges is not necessary to decide this case, because CMS has not issued a rule on the topic.  And the parties have not addressed this argument at great length.  *See* Pl. MSJ at 22–23; Pl. Reply at 20-21; Gov. MSJ at 22.  Rather than engage in dicta about the bounds of CMS's authority should it decide to revise the Regulation, the Court will stick to the case at hand and decline to reach this issue.

### C. The Administrator's Decision Was Arbitrary and Capricious

A final reason the Administrator's decision must be set aside is because it was arbitrary and capricious. The Court agrees with Medica that the decision was arbitrary and capricious because it amounted to an unexplained change in position, although the Court rejects Medica's other arguments that the decision treated similar claims dissimilarly and lacked a logical basis. *See* Pl. MSJ at 23–28.

When an agency changes its existing policies or practices, it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Fox Television Stations*, 556 U.S. at 51). This is so even when an agency departs from past practice rather than past policy. *See Am. Wild Horse Pres. Campaign,* 873 F.3d at 927. Here, the Administrator's decision proceeded as if "merely appl[ying] Section 417.560(c) to reach a conclusion already inherent in its terms." Gov Reply at 20. There was no acknowledgment of a change in position. The Secretary argues that "CMS's prior failure to object to this practice does not mean that it had a policy of allowing that practice, or estop it from enforcing Section 417.560(c) with respect to this practice going forward." Gov. MSJ at 24. While CMS may not have officially sanctioned HMOs including carrier-paid claims in the apportionment ratio, it had a practice of raising no objections.

CMS's argument might well have force if CMS had a policy of excluding carrier-paid claims from the apportionment ratio, but for a time had neglected to enforce this policy against Medica. *See, e.g.*, *Millard Refrigerated Servs., Inc. v. Sec'y of Lab.*, 718 F.3d 892, 898 (D.C. Cir. 2013) (noting that "the mere failure to cite [petitioner] previously can hardly be enough to estop later government enforcement"). Yet CMS's lack of objection, combined with its failure to institute a policy against these charges at the time Medica was including them in its cost reports,

means it was arbitrary and capricious for the Administrator to arrive at her position without displaying awareness that she was engaging in a new approach.

This is reason enough to conclude that the Administrator's decision was arbitrary and capricious. The Court finds Medica's other arguments unconvincing. First, Medica asserts that the Administrator's position is arbitrary and capricious because it "treats similarly situated claims differently." Pl. MSJ at 25. This characterization does not withstand scrutiny. Medica contends that CMS treats carrier-paid claims "entirely differently based upon the year in which it was recouped." *Id*. But this generalized assertion is based solely on a single email from a CMS employee telling Medica that carrier-paid claims recouped after the year in which they were paid could be refunded to CMS through an adjustment to Worksheet M. *See* AR 475–76. The email did not mention including carrier-paid claims in the apportionment calculation. There is therefore insufficient evidence of disparate treatment to prove the Administrator's decision was arbitrary and capricious.

Second, the Court is not prepared to endorse Medica's argument that the Administrator's decision was "fundamentally unsound" because there is "no logical basis" for excluding the carrier-paid claims. *See* Pl. MSJ at 26. Medica is not just denying a "rational connection between facts and judgment," *State Farm*, 463 U.S. at 5, in the particular decision under review. Instead, it seems to be arguing that CMS could *never* have a logical basis to exclude carrier-paid claims, and therefore can never enact such a policy even if the process were otherwise in accordance with law. Applying the "very deferential" arbitrary and capriciousness standard, *Shawal*, 2015 WL 7761053, at *3, the Court will not lightly find that an agency's policy approach can never have a logical basis. Despite the infirmities of the Secretary's reading of the Regulation, the Court will not go so far as to say that the government's policy opposition to including carrier-paid claims, *see*

Gov. MSJ at 23–24, is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

***

Medica's final challenge is that "CMS's retroactive application of its new policy to the cost years at issue violates basic principles of fair notice and due process." Pl. MSJ at 28. The parties seem to dispute not only whether Medica had fair notice but also whether fair notice is a Constitutional requirement of due process or an independent obligation of administrative law. *Compare* Pl. MSJ at 28–30, *and* Pl. Reply at 26–27, *with* Gov. MSJ at 29–30, *and* Gov. Reply at 24–25. Rather than wade into a complex topic unnecessary to the resolution of this case, the Court declines to reach this issue.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** Medica's motion for summary judgment and **DENY** the Secretary's cross-motion for summary judgment. The Administrator's decision in this matter is **VACATED** and the matter is remanded to the agency for further proceedings consistent with this Memorandum Opinion.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: September 28, 2023

Royce C. Lamberth
United States District Judge